**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  12-20199-CR-SEITZ/SIMONTON**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**NOLBERTO FERNANDEZ,**

      **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

This matter arose upon the Motion to Suppress Statements and Physical Evidence Obtained by an Unlawful Search and Seizure (DE # 26) filed by Defendant Nolberto Fernandez.  The Honorable Patricia A. Seitz, United States District Judge, has referred this matter to the undersigned United States Magistrate Judge (DE # 27).  The government has responded in opposition (DE # 30).  The Defendant has not filed a Reply.  An evidentiary hearing was held on July 20, 2012.  At the conclusion of the hearing, the undersigned announced her intended Findings, Conclusions of Law, and Recommendation that the Motion be denied.  This Report and Recommendation sets forth and elaborates upon those Findings and Conclusions of Law.

    I.      **INTRODUCTION**

Defendant Nolberto Fernandez is charged in a one-count Indictment with possession with intent to distribute oxycodone and marijuana on or about March 9, 2012, in violation of 21 U.S.C. § 841(a)(1).  The oxycodone and marijuana that form the basis for this charge were seized from Defendant Fernandez' apartment during a search of that apartment on March 9, 2012.

The presently pending Motion to Suppress challenges the legality of the entry into

the apartment, and the subsequent search of that apartment.  The Defendant contends initially that he did not consent to either the entry or search of his apartment.  In the alternative, the Defendant contends that if the Court finds consent by the Defendant, it was not freely and voluntarily made.  Specifically, the Defendant alleges that the police "duped defendant about the permissibly [sic] of their authority to search" when they told him that they had probable cause to search his apartment based on an alert by the K-9 at his apartment door; and, that the police impermissibly induced consent by making a promise of leniency when they stated that if the Defendant only had a small amount of marijuana, he would be issued a promise to appear and not taken to jail (DE # 26 at 4-5).  At the hearing, defense counsel acknowledged that the police had probable cause to search the apartment, but argued that there was no valid consent; and, the police should have obtained a warrant to search the apartment since there were no exigent circumstances to justify a warrantless search.  The Defendant also seeks to suppress statements he made as fruit of the illegal search (DE # 26 at 3, 10).

In opposition, the Government contends that the entry into the apartment and the subsequent search of the apartment were based upon the Defendant's voluntary consent (DE # 30).  The Government has not relied upon probable cause and exigent circumstances to justify the search.[1]

---

[1]  Although perhaps obvious, the undersigned notes that the Government has not challenged the Defendant's reasonable expectation of privacy in the premises searched, which is the residence of the Defendant.

2

## II.   FINDINGS OF FACT[2]

### A.   Introduction

At the evidentiary hearing, the government presented the testimony of Miami Police Lieutenant Jose Alfonso, and introduced into evidence various exhibits, including photographs of the apartment and the items seized, as well as a printout from the Florida Driver and Vehicle Information Database which reflected the false identification card provided by the Defendant to Lt. Alfonso (GX 1 - 7). The Defendant testified on his own behalf.

Based upon consideration of the evidence as a whole, and for the reasons discussed in more detail below, the undersigned credits the testimony of Lt. Alfonso regarding the events that transpired on the day of the search.  He had a good recollection of the events, and his testimony made sense viewing the totality of the circumstances.   The testimony of the Defendant, on the other hand, was vague; he has a strong motive to challenge the existence of consent, and, he admitted that he had provided a false identification card to the police, which he had obtained because he was a fugitive on a criminal case pending in Massachusetts.  His testimony was therefore not credible in view of the contradictory specific testimony of Lt. Alfonso.

Based upon the credible testimony of Lt. Alfonso, the undersigned makes the following findings.

### B.   Findings of Fact

Lt. Jose Alfonso has been employed by the City of Miami Police Department for

---

[2]  To the extent that these Findings of Fact are more properly characterized as Conclusions of Law, and vice versa, the undersigned intends that they be treated as such.

approximately 25 years.  He currently serves as the field duty commander for the midnight shift.  In the past, he has worked in the areas of narcotics, vice, smuggling, money laundering, and protective details; and, he was in charge of the Internal Affairs department for seven years.  He has attended various training schools regarding narcotics investigations.

On March 9, 2012, Lt. Jose Alfonso was working an off-duty security detail at the Blue Lagoon condominium complex.  In this capacity, he was hired to provide a police presence at the condominium and to handle law enforcement matters.  He received an anonymous complaint from one of the people at the condominium that there was an odor of marijuana coming from an apartment on the 10th floor of the condominium building.  Lt. Alfonso then called Officer Perez, a canine handler, for assistance.

When Officer Perez arrived with his drug detection K-9, they went to the 10th floor and approached apartment 1706.  Both Lt. Alfonso and Officer Perez were wearing police uniforms and were armed.  They could smell the odor of marijuana coming from the right side of the hallway as they exited the elevator, and the dog alerted to the door of apartment 1706.  There had been no prior surveillance of this apartment, and Lt. Alfonso was not aware of any prior incidents at this apartment.

Officer Perez and the dog stood to one side of the door, and Lt. Alfonso knocked on the door to the apartment.  After a minute or two, the Defendant opened the door. The Defendant appeared to be startled by the presence of the police, and was a little nervous.  Lt. Alfonso spoke to the Defendant in spanish,[3] and advised him that they were Miami police officers, and that they were there because they had received a complaint of

---

[3]  The Defendant is bilingual, and testified in English at the suppression hearing.

a strong odor of marijuana.  Lt. Alfonso told the Defendant to relax, that this was not a "big thing."  Lt. Alfonso spoke to the Defendant in a calm voice, and explained that he did so because it was easier to obtain cooperation with "sugar than with salt."  He told the Defendant that when he received complaints like this, and if the Defendant consented to a search and only a small amount of marijuana was found, he would issue the Defendant a notice to appear in court, like a ticket.  Lt. Alfonso advised the Defendant that, if there were no open warrants, the Defendant would not be taken to jail but would be summoned to go to court.  Lt. Alfonso advised the Defendant that if there was a large amount of drugs that it would be a different situation because that would be a felony.  He also told the Defendant that he did not have to consent to the search, but that the K-9 had also alerted to the presence of marijuana, and that he had probable cause to obtain a search warrant if the Defendant did not consent.

While Lt. Alfonso was speaking to the Defendant, the Defendant interrupted him and responded, "No, no, let me show you what I have," and directed Lt. Alfonso past the threshold of the door into the kitchen.  There was some marijuana on the counter; and the Defendant opened the first drawer, and revealed some plastic baggies with marijuana in them.  The Defendant said that this was all he had, and that he was with his girlfriend and they had just smoked a little bit.  He said he was sorry and didn't want to cause any problems.

Lt. Alfonso asked the Defendant if this was all he had, and the Defendant responded that it was.  Lt. Alfonso asked the Defendant if anyone else was in the apartment, and he responded that his girlfriend was there.  Lt. Alfonso told him to call his girlfriend to come out, and the girlfriend then came out of the bedroom.  Lt. Alfonso told the Defendant that he was going to check his information and make sure that

everything was all right.  Lt. Alfonso then asked if there were any other illegal substances in the apartment.  The Defendant responded that there weren't.  Lt. Alfonso again told the Defendant that he did not have to let them search, but asked if they could search with the dog to ensure there wasn't anything else, and the Defendant responded, "No problem."  Lt. Alfonso did not give the Defendant a written consent to search form.

The Defendant and his girlfriend provided identification documents to Lt. Alfonso, and the three of them stepped outside the apartment where Lt. Alfonso ran a records check on them, while Officer Perez and the K-9 searched the apartment.  The identification presented by the Defendant was in the name of Jesus Manuel Santiago Serrano.[4]  The records check revealed that there were no outstanding warrants.

A few minutes later, Officer Perez advised Lt. Alfonso that the dog had alerted to a metal tube that was inside a dresser in the bedroom.[5]  Lt. Alfonso went into the bedroom and saw, in addition to the metal tube which contained approximately 25 or 30 small baggies of marijuana, a money counter,[6] and a large amount of bills in front of the money counter.[7]  Based upon his experience, Lt. Alfonso believed that the amount of money appeared too large to be only from the sale of small quantities of marijuana; so he called for assistance from the area Problem Solving Team.  The Problem Solving Team is

---

[4]  Government Exhibit 1 is a printout from the Florida Driver and Vehicle Information Database (DAVID) which reflects the identification document given to Lt. Alfonso by the Defendant.

[5]  Government Exhibits 3 and 4 show the metal pipe which had the baggies of marijuana concealed inside.

[6]  Government Exhibit 5 is a photograph of the money counter.

[7]  Government Exhibit 2 is a close-up photograph of the currency, which is also depicted in front of the money counter in Government Exhibit 5.

comprised of a group of officers assigned to a particular area, who handle small level drug offenses, and other offenses that the patrol officers are not available to handle.

Two officers from the Problem Solving Team arrived, and the K-9 officer left. The officers searched the apartment and initially did not locate any additional drugs. Lt. Alfonso told them that he believed there had to be something else in the apartment based on the amount of currency and the money counter. After that, one of the officers mentioned that there were some boxes stacked in the closet that had "oxy something" written on them. Lt. Alfonso went into the closet and looked at the boxes, which were labeled "oxycodone." He knew that oxycodone is a heavily abused street drug, as well as a prescribed drug, He opened the boxes and saw many jars of oxycodone pills.[8] At that point, Lt. Alfonso stopped the search and called the Crime Suppression Team sergeant so that the Crime Suppression Team could take over the investigation. The Crime Suppression Team is a group of officers assigned to handle mid-level drug offenses.

At this point, the Defendant, his girlfriend, Lt. Alfonso, and the two officers from the problem solving team waited in the living room area. The Defendant was not handcuffed and was seated on the sofa. His girlfriend was near him, either next to him or across from him.

When the two members of the Crime Suppression Team arrived, Lt. Alfonso met them outside the apartment and briefed them on what had been discovered. Lt. Alfonso then took them inside the apartment and introduced them to the Defendant. The Crime Suppression Team members took the Defendant into the bedroom, leaving his girlfriend

---

[8] Government Exhibit 6 is a photograph of the boxes, which shows the pill bottles that were visible after the boxes were opened by the police.

and the other officers in the living room, and spoke privately to the Defendant.  Lt. Alfonso did not hear what they said, but shortly thereafter, the Defendant led the Crime Suppression Team officers to the kitchen and directed them to certain vitamin bottles in the kitchen.  An examination of the bottles revealed that they contained oxycodone tablets.[9]  The Crime Suppression Team sergeant advised Lt. Alfonso that the Defendant admitted that he had given a false identify to Lt. Alfonso.

In addition to the above police officers, an FBI agent and a DEA agent arrived after the above events.  There were never more than three or four law enforcement officers in the apartment at any given time, however, because as new officers arrived, others left. Lt. Alfonso was in the apartment approximately two hours, and he left after the federal agents arrived, but before the Defendant was taken away.

During the entire above encounter, the Defendant was never handcuffed, and no guns were drawn.  On two occasions–once before Lt. Alfonso entered the apartment and once after the Defendant led Lt. Alfonso into the kitchen and showed him the marijuana– the Defendant was verbally advised of his right to refuse consent, and he gave verbal consent to the entry into and search of his apartment.  The Defendant was not advised of his *Miranda* rights prior to consenting to the search.  The Defendant was extremely cooperative, appeared to understand what was said, and answered responsively.  Lt. Alfonso testified that although it was obvious the Defendant had been smoking marijuana because the apartment was full of smoke, "He was fully alert and conscious and totally understood what I was asking him."  The Defendant never withdrew his consent to search.  The Defendant was never physically restrained, although he was not

---

[9]  Government Exhibit 7 is a photograph of these bottles.

free to leave.

### C.   The Testimony of the Defendant

The Defendant's testimony on direct examination was extremely brief.  He testified that he is 28 years old, and has an eighth grade education.  He does not have a driver's license because he could not pass the examination, although he previously was able to pass it.  He also could not pass the eye examination because he needed glasses.  His poor eyesight was the reason he had eye surgery on March 7, 2012, two days before the events at issue.  He was prescribed medicine after the surgery, and he was high when the police arrived at his door on March 9, 2012.  He was nervous when he opened the door.  The Defendant testified that the police told him they had probable cause, and he believed that he had no say in whether they came inside.  The Defendant testified that they never asked if he consented to their entry, and they never told him he could refuse consent.

On cross-examination, he admitted that he had given the police a false identification card because he was a fugitive on drug charges pending in Massachusetts.  He testified that the officer told him if he had only a small amount of marijuana they would just take it and tell him not to do it again.  The officer did not tell him anything about signing a ticket or other paper.  The Defendant testified that the officer had not forced his way into the apartment, but that when the officer said he had probable cause, the Defendant had stepped aside and the officer just walked in.  The Defendant denied saying anything to the officer since he was nervous, and police officers do what they want.  The Defendant had been previously arrested on two occasions, including the drug charges which were pending in Massachusetts at the time of the search.

D.    **The Testimony of the Defendant Regarding His Lack of Consent is Not Credible**

The Defendant may be mis-recollecting what occurred rather than deliberately committing perjury; but either way his testimony is so far at odds with the testimony of Lt. Alfonso, common sense, and the circumstantial evidence of what occurred, that it is not credible.  Specifically, Lt. Alfonso had no motive to fabricate the evidence in this case–the Defendant was not the target of any investigation and Lt. Alfonso was merely responding to a citizen's complaint as part of his off-duty security detail.  He provided the Defendant with a truthful explanation of what would occur, depending on what was found inside the apartment; and, accurately stated that if the Defendant did not want to consent there was probable cause for a search warrant.  It is unlikely that Lt. Alfonso would walk into the apartment and go directly to the kitchen counter, as well as look inside a drawer, to locate marijuana if the Defendant had not shown him where it was.  Moreover, it seems likely that the Defendant would consent to a search in the hopes that only the small amount of marijuana would be discovered, and that he would be given only a summons to appear in Court, thus enabling him to flee once more.  If a search warrant was obtained, it was more likely that a more thorough search would occur, and that he would be formally arrested and taken to jail, and his true identity would be discovered.

Thus, the undersigned finds that the testimony of the Defendant was not credible with respect to the circumstances surrounding his consent to search the apartment.

In addition, the undersigned finds that the Defendant had the intelligence and capacity to consent to the search, as evidenced by his responses to Lt. Alfonso and the Crime Suppression Team at the time of the search, as well as his ability to understand

and answer questions during his testimony at the hearing on this Motion.  Moreover, the

Defendant is 28 years old and has been previously arrested for drug offenses, thus

lessening any inherently coercive effect caused by the mere presence of police officers.

Finally, although the Defendant had been smoking marijuana prior to the arrival of Lt.

Alfonso, he was responsive, coherent and able to understand the situation.  Although he

testified that he was "high" at the time, he did not testify that he was unable to

understand Lt. Alfonso, or the situation.  His testimony was limited to stating that he was

never asked to consent, and did not stand in the way of the police because he felt he had

no choice.

      III.    <u>**LEGAL ANALYSIS**</u>

The issue of whether the Defendant voluntarily consented to the entry of the

detectives into his apartment is a question of fact to be determined by the totality of the

circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v.*

*Blake*, 888 F.2d 795, 798 (11th Cir. 1989).  The government has the burden of proving by a

preponderance of the evidence that consent was freely and voluntarily given.  *Florida v.*

*Royer*, 460 U.S. 491, 497 (1983); *United States v. Matlock*, 415 U.S. 164 (1974).  In *Blake*,

the Eleventh Circuit established the following factors to be used to assess the validity of

a consent to search: the custodial status of the consenting party; the presence of

coercive police procedures; the extent and level of the person's cooperation with the

police; awareness of the right to refuse to consent to the search; intelligence and

education, and the belief that no incriminating evidence will be found.  *Blake*, 888 F.2d at

798.  Although knowledge of the right to refuse to consent is a factor to be considered, it

is only one factor to be considered under the totality of the circumstances, and the

Supreme Court has expressly stated that there is no presumption of invalidity if the

government fails to establish such knowledge, and that no "extra weight" is to be given "to the absence of this type of warning." *United States v. Drayton*, 536 U.S. 194, 206-07 (2002).  The same factors are relevant to the determination, under the totality of the circumstances, of whether consent to enter the premises has been voluntarily given. However, the primary focus of the voluntariness determination in the context of consent to enter a residence, as opposed to consent to search, is whether the consent was prompted by a show of official authority.

Numerous cases have examined the voluntariness of consent.   For example, in *United States v. Ramirez-Chilel*, 289 F.3d 744, 747, 750-51 (11th Cir. 2002), the Court determined that consent to enter was voluntary despite fact that four agents approached the defendant's residence shortly before midnight, and requested admittance to determine whether there were any counterfeit documents located inside the residence, and the defendant then "yield[ed] the right-of-way to the officers" although he made no verbal response.  Similarly, in *United States v. Tobin*, 923 F.2d 1506, 1508, 1512 (11th Cir. 1991), the Court rejected the argument that the defendant opened his door in response to "a show of official authority" where the agent and a backup officer, who were in plain clothes and had weapons which were not drawn, knocked continuously for three to four minutes and called out to the occupants requesting them to open the door.  *Accord United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (defendant's consent was voluntary despite prior protective sweep, fact that defendant was arrested outside his house and brought inside in handcuffs, the presence of 14 armed agents, and the defendant's initial refusal to consent to the search of the entire premises, where the agents advised the defendant of his rights, and did not threaten the defendant, but merely stated that if he did not consent to search of entire house they would secure the premises and attempt to

obtain a search warrant); *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983) (consent was voluntary where defendant had been stopped at gunpoint, frisked, placed face down on the road, since officers spoke in conversational tone, had reholstered their weapons, did not threaten defendant, and defendant was not handcuffed); *United States v. Juarez*, 573 F.2d 267, 273-74 (5th Cir. 1978)[10] (response of "That's fine" to DEA Agent's statement, "Well, I am going to have to search you," was a valid consent under the totality of the circumstances, including the fact that defendant was given *Miranda* warnings, and was a criminal defense attorney).

In holding that the consents given by the defendants in *Ramirez-Chilel and Tobin* were voluntary, the Court distinguished *United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986), where the defendant's consent was not voluntary because it was prompted by a show of official authority.  In *Edmondson*, FBI agents investigating a bank robbery surrounded the defendant's apartment, drew their weapons, and knocked on the door, yelling, "FBI. Open the door."  Edmondson opened the door, stepped back and put his hands on his head, thereby submitting to an arrest.  Under these circumstances, the Court held that these actions did not constitute consent for the agents to enter the apartment, but were only "an acquiescence to a show of official authority."  *Id.* at 1515 *accord United States v. Tovar-Rico*, 61 F.3d 1529 (11th Cir. 1995) (consent was submission to lawful and not voluntary where preceded by five officers with guns drawn entering apartment and conducting a protective sweep).

Other cases have examined whether threats or promises made by the police have

---

[10]  Decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981 are binding precedent within the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

constituted coercion which rendered a consent to search involuntary.  It is well-settled that a statement that if consent is not forthcoming, the police will obtain a warrant, does not, by itself, render consent invalid.  For example, in *United States v. Welch*, No. 10-14649, 2012 WL 2122163 (11th Cir. Jun. 13, 2012), the Court upheld a determination of voluntariness where, after the defendant refused to give consent, the police told him, "Fine, but we're going to have to get a search warrant" following which the defendant maintained his refusal; and, the officer then stated that "it would take a while," after which the defendant consented.  *Id.* at * 4.   The Court recognized that the defendant's "consent was not coerced, just constrained, by having to place his bet on one of two poor alternatives.  Maybe if he let them in, the police would want to get the search done quickly and fail to find his contraband.  Or maybe if he put them to the trouble of getting a search warrant, they would search more thoroughly because he had inconvenienced them."  *Id.*  Similar results have been reached in other cases.  *United States v. Garcia*, 890 F.2d 355, 361 (11th Cir. 1989) (consent not involuntary based on refusal of law enforcement agents to accept a limited consent to search only certain parts of the premises, stating that if the defendant did not consent to search the entire premises, they would secure the house and apply for a search warrant); *United States v. Long*, 866 F.2d 402, 404-05 (11th Cir. 1989) (consent not coerced where officers requested consent to search for currency they suspected was buried in the yard, and stated if defendant did not consent they would return and "dig the place up"– defendant "was free to force the agents to obtain a search warrant and, if at that time, he did not want 'his whole place dug up,' he could have cooperated").

Finally, in determining whether a consent is voluntary, the Court must also take into account the mental status of a defendant.  However, the mere fact that a defendant

is intoxicated does not, in and of itself, render consent involuntary.  This is only one factor to be considered.  *United States v. Figueroa*, 419 Fed. App'x 973, 977-78 (11th Cir. 2011) (citing cases).  Where a defendant is responsive, coherent and able to understand the situation, intoxication does not vitiate consent.

Turning to the totality of the circumstances present in the case at bar, the undersigned concludes that the government has proven that the Defendant voluntarily consented to the entry of Lt. Alfonso and Officer Perez into his apartment, and that he did not merely acquiesce to a show of official authority.  The most significant facts are that Lt. Alfonso spoke to the Defendant in a calm voice, and the Defendant quickly responded to the request to enter the apartment by inviting him in and showing him where there was a small amount of marijuana.  There was no command given, the discussion was conducted in a calm tone of voice, and the Defendant expressly agreed to let the police enter.   The same is true with respect to the subsequent express consent to allow a K-9 to search the apartment.  This conclusion is supported by a specific examination of the factors identified by the Eleventh Circuit in *Blake, supra*.

(1) The custodial status of the Defendant.  The Defendant was not free to leave, but had not been placed under formal restraint.  He was told that if only a small amount of marijuana was found, he would only be issued a Notice to Appear in court, which is like a ticket.  Thus, although the Defendant knew that he would need to remain to receive the ticket, the coercion inherent in a formal arrest was not present.  This factor militates in favor of voluntariness.

(2)  The presence of coercive police procedures.  The police procedures were not coercive.  There was only brief knocking on the door before the Defendant opened the door and saw the police.  As stated above, there was no command given to open the

door, there were no weapons drawn, the tone of voice was calm, there were no physical or verbal threats.  Although there were two officers and a K-9 present, which is somewhat coercive, none of them had their weapons drawn, and the Defendant was advised that he did not have to consent.  This factor also militates in favor of voluntariness.

(3) The extent and level of the person's cooperation with the police.   The Defendant was calm and cooperative throughout the search.  He immediately showed Lt. Alfonso where the small amount of marijuana was located, and readily consented to the search of the remainder of the apartment.  He continued to cooperate with the Crime Suppression Team officers following the discovery of the oxycodone in the boxes in his closet, by directing them to additional oxycodone concealed in vitamin jars in the kitchen.  He never asked them to stop or expressed any hesitation about the search. This factor militates in favor of voluntariness.

(4) The awareness of the right to refuse to consent to the search.  The Defendant was advised of his right to refuse to consent to the search.

(5) The intelligence and education of the Defendant.   The Defendant appeared to be calm and appeared to understand what Lt. Alfonso was saying.  Although the Defendant has only an eighth grade education and did not pass his driver's license test, he is bilingual and his testimony during the hearing corroborates the fact that he has the ability to understand proceedings and respond appropriately.  He clearly appears sufficiently intelligent to give a voluntary consent.  Moreover, although he had apparently been smoking marijuana, he was responsive, coherent, cooperative and appeared to understand the situation during his interaction with Lt. Alfonso.

(6) The belief that no incriminating evidence will be found.   It is clear that the

16

Defendant knew that a small amount of marijuana would be found; and, it appears likely that he believed this would be the only controlled substance found in his apartment.  The marijuana in the bedroom was well concealed in a metal pipe; and, the oxycodone contained in the stacked boxes in his closet was so well concealed that, but for the insistence of Lt. Alfonso based upon his extensive experience, the police would not have found it.  The Government's argument that the Defendant consented to the search in the hope of avoiding a formal booking process that would inevitably lead to the discovery of his true identity and fugitive status is persuasive in this regard.  These factors militate in favor of concluding that the consent to enter and search was valid.

Finally, the undersigned notes that the consent was not prompted by a promise of leniency.  The Defendant was truthfully advised of the consequences of a search.  If the Defendant refused to consent to search, there was probable cause to obtain a search warrant; in fact, defense counsel argued that the existence of probable cause prior to the time the officers knocked on the door eliminated any possible argument that exigent circumstances justified an entry.  In addition, the Defendant was accurately advised that if only a small amount of marijuana had been found, the Defendant would be given a Notice to Appear in court because that was a minor offense; but if a large amount of drugs was found, that would not be the case because that would be a felony offense.

Based upon the express consent to enter and search the apartment, and the above factors, the undersigned finds and concludes that the Defendant's consent was voluntarily given, was not coerced, and was not the product of mere acquiescence to a show of official authority.

IV.    CONCLUSIONS OF LAW

In summary, in accordance with the above findings of fact and legal analysis, the

undersigned makes the following conclusions of law:

    1.  The Defendant voluntarily opened the door to his apartment in response to the police knocking on the door.

    2.  The odor of marijuana which emanated from the apartment, combined with the anonymous tip and the alert of the K-9, established probable cause to believe that there were illegal drugs inside the apartment.

    3.  The Defendant voluntarily consented to have the police enter his apartment where he showed them marijuana in his kitchen area.

    4.  The Defendant voluntarily consented to the search of his entire apartment by the police.

    5.  The entry, search, and seizure of evidence did not violate the Defendant's rights under the Fourth Amendment to the United States Constitution.

    V.    <u>CONCLUSION</u>

    Therefore, based upon a review of the record as a whole, and the above findings of fact and conclusions of law, it is hereby

    **RECOMMENDED** that the Motion to Suppress (DE # 26) be **DENIED**.

    **DONE AND SUBMITTED** in chambers in Miami, Florida, on July 23, 2012.

    Pursuant to S.D. Fla. Magistrate Judge Rule 4(a), the parties shall have 14 days from the service of this Report and Recommendation to file written objections to this Report and Recommendation.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  ***RTC v. Hallmark Builders,***

*Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.

1988).

_Andrea M. Simonton_
_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**


**Copies furnished to:**
**The Honorable Patricia A. Seitz, United States District Judge**
**All counsel of record via CM/ECF**